# EXHIBIT A

| | |
|---|---|
| **STATE OF NORTH CAROLINA** | **IN THE GENERAL COURT OF JUSTICE** |
| | **SUPERIOR COURT DIVISION** |
| **COUNTY OF FORSYTH** | **FILE NO: 25 CV 009698-330** |

**JANNA GRANT,**
**Plaintiff,**

**v.**

**ASHLEY FURNITURE INDUSTRIES, LLC.,**
**Defendant.**

**COMPLAINT**

The Plaintiff, Janna Grant, complaining of Defendant, alleges the following:

**NATURE OF ACTION**

1. Plaintiff has instituted this action pursuant to Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e, *et seq.* (Title VII), the Age Discrimination in Employment Act, 29 U.S.C. § 621, *et seq.* (ADEA), and the public policy of North Carolina, to recover damages for the violation of her civil rights.

**PARTIES**

2. The Plaintiff, Janna Grant, is a resident of Montgomery County, North Carolina. At all times pertinent to this action, Plaintiff was an "employee" of Defendant within the meaning and definition of 42 U.S.C. § 2000e(f), 29 U.S.C. § 630(f), and North Carolina law.

3. Defendant Ashley Furniture Industries, LLC (Ashley) is a limited liability company established pursuant to the laws of the State of Florida, with its headquarters in Tampa, Florida. Defendant designs, manufactures, and distributes furniture, and conducts business in Forsyth County, throughout North Carolina, the United States, and worldwide. At all times pertinent to



Electronically Filed Date: 9/16/2025 3:54 PM Forsyth Superior Court County Clerk of Superior Court

this action, Defendant employed over 500 employees, and was the "employer" of Plaintiff within the meaning and definitions of 42 U.S.C. § 2000e(b), 29 U.S.C § 630(b), and pursuant to North Carolina law.

## FACTS

### Plaintiff's Employment History

4. Plaintiff is a female. She was born in April, 1967, and is presently 58 years of age. At the time of her termination, she was 56 years of age.

5. Plaintiff was initially employed by Defendant in January, 2005, as an Associate Marketing Specialist. She served in that position until her promotion to Senior Marketing Specialist in June, 2006, the position she held at the time of her termination. Plaintiff worked for Defendant in its sales and marketing divisions throughout her employment.

6. Plaintiff's position as Senior Marketing Specialist required her to identify prospects, match their needs with company products, "tell the story" of Ashley Furniture, and manage sales processes to close businesses.

7. Additionally, Plaintiff was expected to maintain relationships with existing customers to ensure outstanding service; identify new sales opportunities; maintain in-depth product knowledge; and conduct calls, visits, presentations and training sessions for both employees and customers.

8. Plaintiff's territory during the time period immediately preceding her termination was most of eastern North Carolina, stretching from Hickory to the Outer Banks (excluding Charlotte).

9. Indeed, Plaintiff had been instrumental in building out central and eastern North Carolina for Defendant, and expanding its footprint throughout the region. Accordingly,

Defendant earned substantial profits from the many relationships cultivated by Plaintiff in that region in twenty years of service.

10. During the entire period of Plaintiff's employment, she was commended for her performance, and her sales numbers, leadership, and commitment to Ashley met or exceeded any reasonable expectations of her role. Accordingly, Plaintiff was never the subject of any disciplinary action, and she was never made aware of any performance problems. Indeed, Defendant regularly referred to Plaintiff as a leader for the company, and she was salesperson of the year for Defendant's Casegoods Division in 2019.

11. In fact, during the final years of Plaintiff's employment, she was one of the most successful salespeople in the company, and indeed, throughout the greater furniture industry. Plaintiff's sales in 2023 were the second-most in her division. By any metric, Plaintiff was extraordinarily successful, and her performance resulted in enormous revenues for Defendant.

**Plaintiff's Employment Relationship**

12. Although Plaintiff was classified as an independent contractor, her relationship with Defendant was clearly an employer-employee relationship.

13. Upon information and belief, Defendant has a pattern and practice of classifying many of its employees as independent contractors.

14. Accordingly, Defendant receives the benefit of an employment relationship without many of the obligations. Specifically, upon information and belief, Defendant does not pay federal and state taxes in regards to its contractors, it does not provide health, retirement, or other benefits to its contractors, it avoids paying for overtime, worker's compensation insurance, or unemployment insurance, and a host of other financial savings.

15. Defendant's pattern and practice of intentional misclassifications give it an unfair advantage over its competition, cost the state and federal government billions in lost tax dollars, and illegally and unreasonably shift expenses onto its employees who assume Defendant's burden.

16. Plaintiff was clearly an employee of Defendant, which is highlighted in every aspect of her employment.

17. As evidenced by her long tenure, Plaintiff had a permanent relationship with Defendant, and was not hired for a specific project. She was expected to fill – and did fill – ongoing and integral business needs of the company.

18. Defendant controlled nearly every aspect of Plaintiff's work. Plaintiff was trained in all facets of the job, she was assigned a specific territory without her input, which was the exclusive area in which she could sell Defendant's products. She reported to Defendant's management team, and Defendant controlled all processes for pricing, ordering, managing, tracking, and servicing her sales.

19. Defendant set Plaintiff's schedule for events such as furniture markets, down to days and times for appearances, her dress, and what products she presented and marketed. Defendant mandated seminars for its entire sales force, and, upon information and belief, regularly paid stipends or reimbursed expenses to its sales team for travel in regards to events.

20. Defendant trains its salespeople in all facets of the company upon hire, at intensive training sessions at its headquarters. At the training, new salespeople learn how to navigate its electronic portals, website, customer service function, and product lines.

21. Defendant's salespeople are also supervised by Ashley management and, specifically, its vice presidents. The sales force submits weekly reports to management tracking what stores were visited, what products were sold, and inventory management. Additionally,

salespeople hold weekly calls in every division in which goals are implemented, managed, and discussed. Defendant's management team sends weekly territory analyses to its entire sales force, and routinely assigns business plans, delegated projects, and tracks and evaluates its salespeople on assigned plans and goals.

22. Plaintiff had quotas she had to meet each year, and was expected to exclusively utilize Defendant's distribution network and transportation fleet. She also organized and oversaw various functions for dealers in Defendant's facilities.

23. Defendant also maintained control over accounts developed by Plaintiff. It determined what products Plaintiff was permitted to sell, at what price she could sell them, and how much commission she was paid. Defendant even took accounts from Plaintiff and delegated them to her coworkers at times. It created and distributed marketing materials to its sales force—catalogs, market photos, and finish samples—and, critically, expected its sales force to utilize those materials.

24. Plaintiff was not permitted to contract with other manufacturers, or to sell other manufacturers products without the written consent of Defendant. Upon information and belief, Defendant rarely, if ever, gave that consent, as it was "understood" that the relationship was exclusive.

25. Plaintiff also – at the direction of Defendant – held herself out as an employee. She had business cards with Defendant's name, her email signature contained its logo, and her professional web pages were dominated by Defendant's image.

26. By any reasonable analysis or relevant factor, Plaintiff was an employee of Defendant.

**Discrimination against Plaintiff**

27. In or around July, 2022, Plaintiff began reporting to a new supervisor, who was significantly younger and male, and was the Vice President of Casegoods (VP) for Defendant.

28. Plaintiff noted immediately that the VP treated younger and/or male employees more favorably. That fact was clearly evident from the way he interacted with his direct reports, but on multiple occasions the VP was explicit about his preferences.

29. Specifically, in Plaintiff's first substantive meeting with the VP, on or about July 12, 2022, he made a point of asking what Plaintiff's fiancé did for a living. Plaintiff was taken aback, but answered the question, to which the VP responded that it "sounded like" Plaintiff "didn't need to work" given her fiancé's career and income. Plaintiff indicated her shock at the question, but tried to give the VP the benefit of the doubt.

30. After some reflection however, she did decide to escalate the matter to Defendant's president, which she communicated verbally in or around August, 2022.

31. In the meantime, Plaintiff continued to perform at a very high level and continued to drive enormous revenues for Defendant.

32. On or about January 2, 2024, the VP again questioned Plaintiff's role with Defendant in regards to her age and gender. Specifically, in a phone conference, he told her that "since you don't have kids," and "you've made enough money and [have] probably been smart with it, [you are] probably in a place where you could retire."

33. Plaintiff was so concerned by the conversation and its implications for her future with the company, that she memorialized it in an email to the VP on January 7, 2023. In the email, Plaintiff indicated that she believed it showed gender and age animus, and specifically noted the different way the VP treated Plaintiff's younger and/or male colleagues as compared to her.

34. Plaintiff likewise verbally escalated the concern to Defendant's president approximately two weeks later, and forwarded her email correspondence.

35. The VP did not directly respond to Plaintiff's email, but he was clearly angered by the communication. The VP later expressed frustration to Plaintiff when he was questioned about the exchange by Defendant's management team.

36. From that time, until Plaintiff's termination a few months later, the VP was cold and hostile to Plaintiff, particularly as compared to her younger and/or male colleagues. He never criticized her performance or her sales revenues, which remained excellent, but he was invariably condescending towards Plaintiff, ostracized her in her position, and seemed intent on pushing her from her position.

37. Additionally, over the latter half of 2023, Defendant's management shifted one large account from Plaintiff, and prepared Plaintiff's colleagues to assume her duties, in anticipation of forcing her from the company.

**Plaintiff's Termination**

38. Throughout Plaintiff's tenure, her employment was governed by one-year employment contracts that essentially "auto-renewed" each year. At the time of her termination, her contract extended from January 1, 2023 until December 31, 2023.

39. On or about November 29, 2023, the VP called Plaintiff to inform her that Defendant was not continuing her employment nor renewing her contract for 2024. He did not offer any explanation.

40. At the time of her termination, Plaintiff had never had a bad review, had never been the subject of any disciplinary action or reprimand, and had never been put on a performance

improvement plan. To date, Plaintiff has never been offered any explanation for her abrupt termination.

41. Following Plaintiff's termination, her job duties, responsibilities, and her book of business – that she had developed over two decades working for Defendant – were all distributed to substantially younger and/or male colleagues.

42. The termination of Plaintiff – despite more than twenty years of unimpeachable performance and dedication – was clearly pretextual discrimination based on gender and age, and transparent retaliation for objecting to discriminatory animus and raising those issues with Defendant's management team.

43. As a result of Defendant's actions, and Plaintiff's inability to attain comparable employment, Plaintiff has suffered extraordinary damages; financially, emotionally, and professionally.

**ADMINISTRATIVE REMEDIES**

44. On May 16, 2024, Plaintiff filed EEOC Charge # 430-2024-02831 with the Equal Employment Opportunity Commission (EEOC) in Charlotte, North Carolina. Plaintiff's charge alleged sex, gender, and age discrimination and retaliation.

45. On May 30, 2025, the EEOC issued notice of Plaintiff's right to sue with respect to her charge against Defendant.

46. Plaintiff has complied with all procedural prerequisites prior to filing this claim.

**FIRST CLAIM FOR RELIEF**
**Gender Discrimination in Violation of Title VII of the Civil Rights Act of 1964, *as amended***

47. Plaintiff incorporates the foregoing paragraphs as if fully set out herein.

48. At all times pertinent to this action, Plaintiff was within a protected class as a female, she was subject to the protections of Title VII, she alerted management to violations of Title VII, and her performance exceeded any reasonable expectations of her employer and was superior to that of male employees, and those who had not complained of and opposed discrimination in the workplace.

49. Defendant wrongfully and intentionally discriminated against Plaintiff because of her gender, in violation of Title VII, as follows:

a. By continuously questioning Plaintiff about her position and intentions for the future because of her gender;

b. By indicating that Plaintiff could rely on her husband for financial support;

c. By reprimanding Plaintiff following her report of the above discriminatory practices;

d. By delegating her book of business and job responsibilities to younger and/or male colleagues;

e. By ostracizing her in her position;

f. By terminating Plaintiff's employment; and

g. By manufacturing false and baseless reasons for her termination.

50. Defendant's reasons for its termination of Plaintiff are pretextual, and unworthy of belief.

51. As a proximate result of Defendant's illegal acts of gender discrimination against Plaintiff, Plaintiff has suffered substantial damages, including lost income and benefits and other economic losses; mental anguish and emotional distress; loss of reputation and quality of life; and other damages to be proven at trial.

52. Plaintiff is entitled to appropriate relief pursuant to Title VII, including compensatory damages and reasonable attorneys' fees and costs for her representation herein pursuant to 42 U.S.C. § 2000e-5(k).

**SECOND CLAIM FOR RELIEF**
**Retaliation in Violation of Title VII of the Civil Rights Act of 1964, *as amended***

53. Plaintiff hereby incorporates the allegations of the foregoing paragraphs as if fully set forth herein.

54. As alleged above, Plaintiff objected to clearly discriminatory practices enacted and condoned by Defendant's management team. Plaintiff reported those practices verbally, and in writing to Defendant's management team.

55. Following Plaintiff's objections to those practices, she was retaliated against, for the above protected activity in violation of Title VII, 42 U.S.C. § 2000e-3, as follows:

a. By reprimanding Plaintiff following her report of the above discriminatory practices;

b. By delegating her book of business and job responsibilities to younger and/or male colleagues;

c. By ostracizing her in her position;

d. By terminating Plaintiff's employment; and

e. By manufacturing false and baseless reasons for her termination.

56. Defendant's purported reasons for termination of Plaintiff are pretextual, and unworthy of belief.

57. As a proximate result of Plaintiff's opposition to discriminatory practices, and Defendant's subsequent retaliatory acts against Plaintiff, Plaintiff has suffered substantial

damages, including loss of income and benefits and other economic losses, mental anguish and emotional distress, loss of reputation and quality of life, and other damages to be proven at trial.

58. Plaintiff is entitled to appropriate relief pursuant to Title VII, including compensatory damages and reasonable attorney's fees and costs for her representation herein, as set forth above.

**THIRD CLAIM FOR RELIEF**
**Age Discrimination in Violation of the ADEA**

59. Plaintiff incorporates the foregoing paragraphs as if fully set out herein.

60. At all times pertinent to this action, Plaintiff was within the protected age category, and subject to the protection of the ADEA; her performance was superior to that of substantially younger employees who were retained, and exceeded any reasonable expectations of Defendant; and subsequent to her discharge, substantially younger employees who were less experienced and qualified for the job, assumed her duties while performing at a lower level than Plaintiff.

61. Defendant wrongfully and intentionally discriminated against Plaintiff because of her age, in violation of the ADEA, 29 U.S.C. § 621 *et seq*., as follows:

a. By continuously questioning Plaintiff about her position and intentions for the future and retirement;
b. By indicating that Plaintiff could retire given her age;
c. By reprimanding Plaintiff following her report of the above discriminatory practices;
d. By delegating her book of business and job responsibilities to younger and/or male colleagues;
e. By ostracizing her in her position;

f. By terminating Plaintiff's employment; and

g. By manufacturing false and baseless reasons for her termination.

62. Defendant's reasons for its termination of Plaintiff are pretextual, and unworthy of belief.

63. As a proximate result of Defendant's acts of age discrimination against Plaintiff, Plaintiff has suffered substantial damages, including loss of income and benefits and other economic losses, and is entitled to appropriate relief pursuant to the ADEA, including compensatory and liquidated damages, and reasonable attorneys' fees and costs for her representation pursuant to 29 U.S.C. § 626.

**FOURTH CLAIM FOR RELIEF**
**Retaliation in Violation of the ADEA**

64. Plaintiff incorporates the foregoing paragraphs as if fully set out herein.

65. As alleged above, Plaintiff objected to clearly discriminatory practices enacted and condoned by Defendant's management team. Plaintiff reported those practices verbally, and in writing to Defendant's management team.

66. Defendant wrongfully and intentionally retaliated against Plaintiff because of her age, in violation of the ADEA, 29 U.S.C. § 621 *et seq*., as follows:

a. By reprimanding Plaintiff following her report of the above discriminatory practices;

b. By delegating her book of business and job responsibilities to younger and/or male colleagues;

c. By ostracizing her in her position;

d. By terminating Plaintiff's employment; and

e. By manufacturing false and baseless reasons for her termination.

67. Defendant's reasons for its termination of Plaintiff are pretextual, and unworthy of belief.

68. As a proximate result of Defendant's acts of retaliation against Plaintiff, Plaintiff has suffered substantial damages, including loss of income and benefits and other economic losses, and is entitled to appropriate relief pursuant to the ADEA, including compensatory and liquidated damages, and reasonable attorneys' fees and costs for her representation pursuant to 29 U.S.C. § 626.

**FIFTH CLAIM FOR RELIEF**
**Wrongful Discharge in Violation of the Public Policy of North Carolina**

69. Plaintiff hereby incorporates the foregoing paragraphs as if fully set forth herein.

70. The public policy of North Carolina, as expressed in N.C. Gen. Stat. § 143-422.2, mandates that employers of fifteen or more employees shall not discriminate or retaliate on the basis of gender or age, or engage in discriminatory practices in the workplace. At all times pertinent to this claim, Defendant employed in excess of fifteen employees.

71. As stated above, Plaintiff was female over the age of 40 who was protected by the public policy of North Carolina and, who was, at the time of her termination, consistently performing at a level higher than other employees who were similarly situated.

72. Plaintiff, after clear and transparent discriminatory treatment by Defendant, objected to the practices, and was reprimanded specifically for those objections.

73. Following that reprimand, she was retaliated against, ostracized in her position, and ultimately terminated.

74. Defendants' reasons for its termination of Plaintiff are pretextual, and unworthy of belief.

75. Defendants wrongfully and intentionally discriminated and retaliated against Plaintiff because of her objection to discriminatory practices, in violation of the public policy of North Carolina, as described in detail above.

76. Plaintiff will suffer irreparable harm in the absence of equitable relief from this Court, and there is no adequate remedy at law to prevent such harm. Accordingly, Plaintiff is entitled to declaratory, injunctive and equitable relief including reinstatement of Plaintiff to her position with Defendants.

77. As a proximate result of Defendants' violations of the public policy of North Carolina, Plaintiff has incurred and suffered substantial damages, including lost income and benefits and other economic losses; mental anguish and emotional distress; loss of quality and enjoyment of life, and employment reputation; and other losses to be proven at trial.

78. The acts of Defendant, as described above, were deceptive, willful and wanton, and evinced an intentional or reckless indifference to and disregard for the civil rights of Plaintiff. Aggravating circumstances concerning Defendants' conduct are provided in ¶¶ 4-43 above. Accordingly, Plaintiff is entitled to punitive damages in an amount to be determined by the jury.

**PRAYER FOR RELIEF**

The Plaintiff requests the following relief:

(1) That Plaintiff be reinstated to her position with Defendant, with back pay and all benefits and seniority rights;

(2) That Plaintiff recover of the Defendant compensatory damages in an amount in excess of $100,000;

(3) That Plaintiff recover liquidated damages pursuant to 29 U.S.C. § 626;

(4) That Plaintiff recover punitive damages in an amount to be determined by the jury;

(5) That Plaintiff recover the costs of this action, including reasonable attorneys' fees for her representation herein as required in 42 U.S.C. 2000e, *et. seq*, and 29 U.S.C. § 626;

(6) That Plaintiff recover pre-judgment and post-judgment interest on all damages awarded herein; and

(7) That this Court grant such other relief as it deems just and appropriate.

**Request for Jury Trial**

Pursuant to Rule 38(b) of the North Carolina Rules of Civil Procedure, Plaintiff hereby demands a trial by jury on all issues presented herein.

This the 16th day of September, 2025.

*/s/ R. Michael Elliot*
R. Michael Elliot
N.C. State Bar No. 42806
Attorney for Plaintiff
Elliot Morgan Parsonage, PLLC
300 E. Kingston Ave, Suite 200
Charlotte, NC 28203
Telephone: (704) 707-3705
Facsimile: (336) 724 -3335
Email: michaelelliot@emplawfirm.com